```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
                   Case No.:  15-24038-CV-COOKE
```

ADANA INVESTING, INC.,                )
a British Virgin Islands company,     )
                                      )
                Plaintiff,            )
                                      )
        -v-                           )
                                      )
FORREST CAPITAL PARTNERS, INC.,       )
a Florida corporation,                )
FORREST CAPITAL AND CO LLC,           )
a Florida limited liability company, )  Miami, Florida
WEATHERVANE PRODUCTIONS, INC.,        )  September 14, 2016
a Nevada corporation,                 )  11:09 AM - 12:07 PM
WVP HOLDING, LLC, an Oklahoma         )  Pages:  1-25
limited liability company,            )
BENJAMIN MCCONLEY, an individual,     )
JASON VAN EMAN, an individual,        )
THE JV GROUP, LLC, an Oklahoma        )
limited liability company, and        )
CAPITAL B, LLC, a Florida limited     )
liability company,                    )
                                      )
                Defendants.           )
```

**MOTION HEARING**
BEFORE THE HONORABLE MARCIA G. COOKE
UNITED STATES DISTRICT COURT JUDGE
```

APPEARANCES:

For the Plaintiff          **JOHN D. COURIEL, ESQUIRE**
                           **STEPHANIE L. HAUSER, ESQUIRE**
                           Kobre & Kim, LLP
                           Two South Biscayne Boulevard
                           Suite 3500
                           Miami, Florida 33131
                           305.967.6115
                           john.couriel@kobrekim.com
                           stephanie.hauser@kobrekim.com

APPEARANCES CONTINUED:

For the Defendants          **RAMON HERNANDEZ, ESQUIRE**
                            **ARTURO V. HERNANDEZ, ESQUIRE**
                            Arturo V. Hernandez, P.A.
                            40 Northwest Third Street
                            Suite 200
                            Miami, Florida 33128
                            305.579.4850
                            avhlaw@bellsouth.net

STENOGRAPHICALLY            **TAMRA K. PIDERIT, RDR, CRR**
REPORTED BY:                Official Court Reporter to the
                            Honorable Marcia G. Cooke
                            400 North Miami Avenue
                            Suite 11S03
                            Miami, Florida 33128
                            305.523.5158
                            tamra_piderit@flsd.uscourts.gov

**P R O C E E D I N G S**

1

2    (Court called to order at 11:09 AM.)

3    **THE COURT:**  Have a seat, Counsel, while we check this

4    out.  Because this is their motion.

5    MR. COURIEL:  Yes, it is, Your Honor.  We have checked

6    to see if we have gotten any calls or anything, and we haven't.

7    **THE COURT:**  Are they coming from out of town?

8    MR. COURIEL:  No.

9    **THE COURT:**  Okay.  So we don't have airport issues.

10   MR. COURIEL:  If I may, Your Honor, John Couriel for

11   Plaintiff, Adana Investing.  I just wanted to make a note for

12   the record.

13   We had a hearing in this matter -- actually, we had a

14   hearing in a related case before Judge Otazo-Reyes.

15   **THE COURT:**  So you know that they are actually living,

16   breathing human beings?

17   MR. COURIEL:  Indeed.  The point that I was going to

18   make for Your Honor is that an issue that kept coming up in that

19   proceeding was today's date.

20   **THE COURT:**  Okay.  All right.  Let's see what happened.

21   Maybe something slid through us.

22   Ivan or Yasir, you haven't gotten a call that anybody

23   is delayed?

24   THE LAW CLERK:  It's on there.

25   **THE COURT:**  Let's take a break.  I will see if we can

1    get in touch with counsel and come right back out.

2         MR. COURIEL:  Thank you.

3         (Recessed at 11:11 AM.)

4         (Resumed at 11:34 AM.)

5    **THE COURT:**  All right.  We are on the record in *Adana*

6    *Investing v. Forrest Capital Partners, et al.*  Appearing for the

7    Plaintiff.

8         MR. COURIEL:  Good morning, Your Honor.  John Couriel

9    and Stephanie Hauser for the Plaintiff, Adana Investing, Inc.

10        **THE COURT:**  Appearing on behalf of Capital Partners, et

11   al.?

12        MR. RAMON HERNANDEZ:  Good morning, Your Honor.  Ramon

13   Hernandez and Arturo Hernandez on behalf of the Defendants.

14        **THE COURT:**  Counsel for Forrest Capital Partners, this

15   is your motion to compel arbitration and stay discovery of

16   proceedings.  You may proceed.

17        Counsel for Plaintiff, you may take your seat.

18        MR. RAMON HERNANDEZ:  Thank you, Your Honor.

19        Your Honor, this proceeds from a referral by the

20   Magistrate Court.  The Magistrate Court originally heard these

21   motions, they were briefed, and the Court decided or the

22   magistrate judge decided to refer to the District Court because

23   it was essentially outcome determinative in the sense that

24   compelling arbitration would require a stay of proceedings, and

25   that would be a decision left to the District Court.

```
 1              Our motion is quite straightforward.  We are arguing
 2       that the Funding Agreement is the primary agreement between
 3       these parties, and, therefore, it's -- the arbitration provision
 4       which it contains must be enforced.  It is the agreement which
 5       most comprehensively sets forth the obligations between the
 6       parties in this transaction.  It is, in fact, the only agreement
 7       which names and encompasses the actual parties to this
 8       litigation.
 9              THE COURT:  So should I ignore the Bridge Facility
10       Agreements, or is that something different?
11              MR. RAMON HERNANDEZ:  That is something entirely
12       different.  Plaintiff would argue that that is the agreement
13       that should be enforced.  That is, however, in wild
14       contradistinction to the case law.  The Bridge Facility
15       Agreement only contains three terms.  It contains the amount of
16       the loan, when it was to be repaid, and the interest rate.
17              Now, as you can see from Plaintiff's far-reaching
18       amended complaint, which includes several counts of conversion,
19       common law conversion, fraud in the inducement, among others,
20       they are alleging a far-reaching conspiracy, and that conspiracy
21       only comes to light in view of the Funding Agreement.  Because
22       they allege that they gave a loan to -- they gave a loan to the
23       Defendants and that those Defendants essentially devised a huge
24       and nefarious scheme to -- excuse me, devised a huge scheme to
25       pilfer away that money, and that they induced them by holding
```

```
 1      themselves out as experienced film producers and people who

 2      were -- and they provided this Funding Agreement which had terms

 3      that gave them a sense of security that this transaction was

 4      going -- was legitimate and secure.

 5            Now, Plaintiff has tried exceedingly hard to minimize

 6      the Funding Agreement.  Plaintiff's strategy has been to disavow

 7      it entirely, even though they cite it begrudgingly in the

 8      amended complaint only once to set forth the terms described in

 9      how the entire transaction was supposed to work.

10            THE COURT:  Counsel, let me ask you this question:  All

11      these agreements, the Bridging Facility Agreements, the First

12      Security Agreement, the Second Security Agreement, and the

13      Funding Agreements, it looks as if they are all entered into

14      contemporaneously.  Like an agreement on 5/5 has a Bridging

15      Facility Agreement, a First Security Agreement, a Second

16      Security Agreement, and the Funding Agreement.

17            MR. RAMON HERNANDEZ:  Yes --

18            THE COURT:  You don't have them entered into a

19      disparate time.

20            MR. RAMON HERNANDEZ:  No, Your Honor.  They aren't

21      all -- if you can imagine them all as part of a closing package,

22      then, yes, the way Your Honor has described it is precisely

23      correct.

24            Now, and the case law that we provided in our briefs is

25      pretty stout on this point that when you have an agreement or
```

1    you have a transaction with multiple agreements, you must look

2    at the agreement that defines the overall relationship or most

3    encompasses the overall relationship in order to determine which

4    dispute resolution provision governs.

5         Now, this case that I'm referring to is *Dental*

6    *Associates, P.C. v. Am Dental Partners of Michigan, LLC.*  It's a

7    case out of the Sixth Circuit Court of Appeals, and what it says

8    is very simple.  It holds as follows, it says, "In the context

9    of multiple agreements, the critical inquiry in determining

10   whether a dispute follows under an arbitration clause is whether

11   the action can be maintained without reference to the agreement

12   containing the arbitration clause.  Where there are multiple

13   contracts between the parties, the dispute is arbitrable

14   pursuant to the arbitration clause in a related contract if the

15   arbitration clause is part of the umbrella agreement governing

16   the parties' overall relationship."

17        So Your Honor is correct.  The four contracts were

18   signed contemporaneously.  But if you look at who signed each

19   contract, the BFA was signed between WVP Holding, LLC and Adana.

20        So if you imagine it, imagine these contracts at hubs

21   and spokes.  So the BFA has one spoke; Adana, WVP.  The First

22   Security Agreement has three spokes; the FCP, WVP Holding, LLC,

23   and Adana.  The Second Security Agreement, also two spokes;

24   Adana, WVP Holding.  The Funding Agreement has one spoke, Adana;

25   another spoke, Forrest Capital Partners, Inc.; another spoke,

1    WVP Holding, LLC; another spoke, WeatherVane Productions;

2    another spoke, Ben McConley; and last spoke, Jason Van Eman.

3         So you see when you compare -- when you compare the

4    contracts beside each other, one very clearly defines the entire

5    scope of the relationship.

6         Moreover, the Plaintiff is arguing that those three

7    terms that are included in the BFA, interest rate, amount

8    loaned, and repayment date, is sufficient to make out their

9    case, but that's not what they are alleging.  They are not

10   alleging a straight-up breach of contract for a loan unpaid.

11   They are alleging a far-reaching conspiracy that is multifaceted

12   and includes parties that appear nowhere in the BFA.

13        But yet they don't swoop out of nowhere.  They are not

14   just random actors coming in to pilfer the money of the

15   Plaintiff.  They were signatories to this contract.  They were

16   bound together in this contract.  They are not random actors.

17        This is an important case, and it really goes to the --

18   the case that we provided that is most on point with the facts

19   here is *Fazio v. Lehman Brothers, Inc.*  That's another case out

20   of the Sixth Circuit where that involved facts very similar to

21   this.

22        Fazio was a broker-dealer or stockbroker who had

23   basically worked in the employ of a number of brokerage houses

24   and had -- defrauded his customers out of $54 million, even more

25   than is at stake here.  And the brokerage houses sought to

1    enforce the arbitration provisions that are included on all of

2    their Account Agreements.

3          The District Court disagreed.  I think the District

4    Court found that the fraud was just too egregious.  And,

5    obviously, Fazio or the brokerage houses appealed, and the Sixth

6    Circuit saw it very differently.  It held in a way that is very

7    instructive here.  It says, "The proper method of analysis is to

8    ask if an action could be maintained without reference to the

9    contract or relationship at issue.  It is evident that

10   fraudulent activities" -- this is quoting from the case -- "it

11   is evident the fraudulent activities were a violation of the

12   Account Agreements and arose out of activities contemplated by

13   those agreements, the sale of accounts.  The lawsuit by

14   necessity must describe why the broker was in control of the

15   plaintiff's money and what the brokerage house's obligations

16   were.  The plaintiffs, therefore, cannot maintain their action

17   without reference to the Account Agreements, and, accordingly,

18   this action is covered by the Arbitration Agreements."

19         Now, when Plaintiff in this case wants to make out

20   their fraud, they do.  In the strictest sense they refer to the

21   terms of the Funding Agreement, because the Funding Agreement

22   lays out the dynamics of the transaction and what was supposed

23   to be done with the Plaintiff's money once it was loaned.  So in

24   that way, they must necessarily describe the Funding Agreement

25   and the terms laid out to describe the Defendants' deviation

1    from those -- from those promises. It cannot describe the fraud

2    without making reference to the promises that were made in the

3    Funding Agreement.

4          **THE COURT:** Let me ask this question: Are you like or

5    unlike *International Underwriters vs. Triple 1?*

6          MR. RAMON HERNANDEZ: We are unlike that case, Your

7    Honor.

8          **THE COURT:** And why is that?

9          MR. RAMON HERNANDEZ: Well, Your Honor, for the reasons

10    that I described, our case is distinguishable on that case. The

11    *International Underwriters* case dealt with an agreement, a

12    separate agreement that was found to be immaterial to the case

13    at hand and did not need to be referenced. But in this case

14    that's not what we have. The facts that we have necessarily

15    rely on the Funding Agreement.

16          The *International Underwriters* case I think the case --

17    the agreement in that case was more akin to the Security

18    Agreements here which are clearly extraneous from the substance

19    of the transaction. The transaction was one that described the

20    following: Adana would loan these entities the money, would go

21    into a secured account. Then it would be matched by the other

22    Defendants and be used to draw down a loan in that amount to

23    collateralize a loan, and then that money would be repaid within

24    120 days plus interest. That was the nature of the investment,

25    that was what Adana thought they were getting out of this.

1    Okay?

2          What I just described to you, which is what -- which is

3    what Plaintiff is alleging is the source of the fraud, is laid

4    out in the Funding Agreement.  So you see, if you look at it --

5    again, I would get back to this point of what it would look like

6    if they were truly simply relying on the BFA to the exclusion of

7    the Funding Agreement.  It would be one count.  It would be one

8    count of breach of contract for failing to repay the loan within

9    125 days.  Plaintiff is free to allege that, but that is not

10   what they have alleged.

11         I would finish with this, Your Honor:  The case simply

12   cannot -- Plaintiff's case simply cannot be sustained without

13   reference to the Funding Agreement.  They need to rely on it.

14   In part, because that was what constituted the fraud in the

15   inducement, at least according to them.  They thought that they

16   were getting into a transaction that was going to be controlled,

17   that was going to be subject to these terms to give them the

18   security that they needed that their money was going to be well

19   taken care of and secure.  Okay?  Because otherwise if it was

20   just a straight-up loan, it wouldn't have been a very smart one.

21         I think that's enough -- that concludes our initial

22   presentation, Your Honor.  I would ask if the Court has any more

23   questions.

24         **THE COURT:**  Let me hear from the Plaintiff.

25         MR. COURIEL:  Good morning, Your Honor.

1          **THE COURT:**  So if everything in these agreements say

2     look at everything together, why would I carve out a portion of

3     this case not to be arbitrated?

4          MR. COURIEL:  We don't want you to carve anything out,

5     Your Honor.  We want you to look at all the agreements together,

6     and we think doing so leads to the inescapable conclusion that,

7     just as the Court noted in *Triple I,* is the case here.  We want

8     you to look at the Funding Agreement.  They are right.  You

9     should look at all of the agreements executed contemporaneously.

10         Just as in *Triple I,* what we have here is a note, in

11    this case the Bridging Facility Agreement, which tells us when

12    is it due, how much, what's the interest payment.  It's the note

13    that they are in breach of.

14         The Funding Agreement, much like the escrow agreement

15    in *Triple I,* says what happens to the money after it's been

16    paid?  What happens in the context of that business relationship

17    after the obligations in the Bridging Facility Agreement have

18    happened?  And the trouble with their position, Your Honor, is

19    it may be that the Funding Agreement is the principal agreement

20    between FCP and WVP.  It may be the document that creates their

21    business relationship and outlines what's going to happen once

22    they get our money.

23         But, Your Honor, this was a scam.  Our money was taken.

24    And as we briefed, it was the latest in a series of scams where

25    new money was being used to pay out old obligations.  And,

1   unfortunately for our client, they were the last person at the
2   end of that game of musical chairs.

3        The Defendants' attempt to try to arbitrate this theft
4   of our funds is a little bit like committing a pure conversion
5   and then saying -- like a bank robbery and saying, well, my
6   Account Agreement has an arbitration provision in it, so that
7   should govern all of our relationships.

8        We don't run from the Funding Agreement at all, not one
9   iota.  We say, much like it was in *Triple I*, and here I'm going
10  to quote from Judge Hinkle's, I think, very thoughtful opinion,
11  he said -- this is at 1346, 533 F.3d 1346, "The transactions
12  contemplated by the Escrow Agreement" -- there the only
13  agreement that had an arbitration clause -- "did not include an
14  already underway fraudulent scheme that the perpetrators
15  undoubtedly would have been more than willing to carry out
16  without any escrow transaction at all."

17       And I would note that in that case, Your Honor, the
18  Court not only found that the dispute wasn't arbitrable, the
19  Court had an even better basis than it does in this case for
20  finding arbitrability.  The arbitration provision in the escrow
21  agreement there said this agreement and all agreements
22  contemplated hereby.

23       In our case, the Funding Agreement just says this
24  agreement in that arbitration provision.  The parties -- Your
25  Honor was correct at the outset to note there are two Security

1    Agreements, there is a Bridge Financing Agreement, there is a

2    Funding Agreement, and you have to look at the structure all

3    together.  If the parties wanted a dispute about nonpayment to

4    be arbitrable, they would have never, never had a Security

5    Agreement that not only doesn't contain an arbitration

6    provision, but gives us the right to come directly into court

7    without opposition and effectuate our security interest.

8           **THE COURT:**  But why sign all these agreements on the

9    same day and then have this obvious arbitration clause in one?

10          MR. COURIEL:  So that if there was a problem with any

11   of the mechanical, but not crux, issues addressed in the Funding

12   Agreement.  For example, if the drawdown had happened more than

13   two days late, that's one example, or if a blocking condition in

14   one of the accounts had not materialized.  Those things that

15   don't go to the heart of the note would not have been a matter

16   for this Court to consider.

17          And it's not uncommon, Your Honor, as Your Honor I'm

18   sure knows, in a financing agreement like this to have a number

19   of documents and a number of transactions all being effectuated

20   at the same time.  The idea was to avoid disputes that would

21   have caused the parties to go to court over operational,

22   mechanical disputes about what happened to our money after it

23   got to the master account.

24          The trouble here, Your Honor, is it was stolen before

25   it got to the master account.  Your Honor is aware that, you

```
1    know, in the almost a year that this matter has been pending,

2    there has been no -- Defendants are not hiding the fact that

3    they are just stonewalling discovery, they are not disputing any

4    of the allegations that we have made.  They are just relying,

5    they are hanging their entire theory of this case on this very,

6    very thin read, which we think would allow the arbitrability of

7    some disputes.

8              But the core question that *Triple I* answers in the

9    negative for us, and I think that is the controlling case, it's

10   the Eleventh Circuit, not one of these Sixth Circuit case cited

11   for the first time in their reply brief, by the way, which, by

12   the way, we think help us.  But leaving that all aside, *Triple I*

13   is the root case, and what it says is the bottom line is the

14   parties agree to arbitrate this dispute.

15             **THE COURT:**  You agree that the arbitration clause is in

16   the BFA?

17             MR. COURIEL:  No.  The arbitration clause is in the

18   Funding Agreement.

19             **THE COURT:**  The Funding Agreement.  And doesn't the

20   Funding Agreement list the obligations from the BFA?

21             MR. COURIEL:  The Funding Agreement is not the source

22   of them, but it does talk about them, as was the case in

23   *Triple I*.  So to give --

24             **THE COURT:**  But in *Triple I*, are all the agreements

25   contemporaneously signed and entered into?  Isn't there some
```

1    time gap?

2         MR. COURIEL:  I don't think that makes a difference,

3    although I believe that it may be that the escrow agreement

4    happened after the fact.  I don't think that matters, Your

5    Honor, because at the end of the day, if the Funding Agreement

6    said --

7         **THE COURT:**  So when would it matter?  Meaning when do I

8    have a situation where I have an obvious arbitration agreement,

9    or agreement to arbitrate, referencing nonarbitrable agreements

10   but the obligations for all of them appear in each other?

11        MR. COURIEL:  Right.  I think we need to take a few

12   steps in that direction.  One step is if the language said this

13   agreement and other agreements contemplated hereby.

14        **THE COURT:**  But isn't there a scope in one of the

15   arbitration agreements saying that this agreement, if there is

16   questions about scope, et cetera, comes under the arbitration

17   clause?  Isn't that in one of them?  Did I misread or am I

18   misremembering?

19        MR. COURIEL:  I don't think that's right, Your Honor.

20   But I do believe that even if that is contained in the Funding

21   Agreement, the core obligation of the Security Agreements and

22   the Bridge Financing Agreement would be rendered completely

23   meaningless if, in fact, the proposed reading Your Honor is

24   suggesting were true, if the Funding Agreement somehow had a

25   provision that eclipsed our ability to run into court under the

1    Security Agreements and secure our collateral.  Judge Torres

2    spent a lot of time analyzing this in our hearing.  And, indeed,

3    I think it's because the transactions are all done

4    contemporaneously that you have to look at them as a, you know,

5    as a nexus.

6            I don't disagree.  I'm not trying to read out.

7            **THE COURT:**  So each Funding Agreement you agree

8    includes a binding arbitration clause?

9            MR. COURIEL:  The Funding Agreement contains a binding

10   arbitration clause as to certain disputes.

11           **THE COURT:**  And doesn't it not say in the Funding

12   Agreement that any dispute, claim, or controversy arising out of

13   or relating to this agreement or the breach, termination,

14   enforcement, interpretation, or validity thereof, including the

15   determination of the scope or applicability of this agreement to

16   arbitrate, shall be determined by binding arbitration in Miami?

17           MR. COURIEL:  Yes, that is what it says, Your Honor.

18   But that doesn't mean that that addresses the overall nexus.  It

19   says "this agreement."  That's essentially the same language

20   that Your Honor would have seen in the *Triple I* case.

21           Look at the *Dental Associates* case, for example.

22           **THE COURT:**  But isn't this lawsuit a dispute about the

23   Funding Agreement?

24           MR. COURIEL:  No, it is not.  It is that only at most

25   in part.  So the Funding Agreement -- if we had a dispute about

1    the Funding Agreement, what we would have is the money had

2    arrived, and it wasn't disbursed pursuant to the terms of the

3    Funding Agreement.  What we -- the money was never -- the money

4    never made it there, Your Honor, because it was just taken.  It

5    was taken from us as it had been taken in previous iterations of

6    this fraud.

7         **THE COURT:**  See, here is my issue, and maybe you can

8    help me understand this, and I think Defendant spoke to it a

9    bit, and that is these documents are like a closing in any other

10   transaction, and you have multiple documents needed in order to

11   effectuate the entire transaction.  So what you are asking me to

12   do is to pull out an important document in this transaction and

13   say it doesn't apply.

14        MR. COURIEL:  I'm not sure that's what I'm asking Your

15   Honor to do.  For example, there are different choices of law

16   provisions in each agreement.  I think that if we had certain

17   types of disputes, we would be arbitrating them under the

18   Funding Agreement.  We would be at this point settled, I would

19   expect.

20        But that's not the question that Your Honor has to

21   decide.  The question Your Honor has to decide is this

22   particular dispute, and that is the conversion of our funds, the

23   obliteration of our collateral, which has been taken in clear

24   violation of the Security Agreements, are those disputes

25   arbitrable?

1                 To put it slightly differently, if we read the case as

2     Defendants propose, then any time any agreement in a big closing

3     set had an arbitration clause in it, we would have to say let's

4     cast that net.  And, indeed, that's not what the law requires us

5     to do.  Where there are multiple contracts, we have to look at

6     the intent of each and say a dispute arising under this, is it

7     arbitrable?

8                 Moreover, Your Honor, I would note that the Eleventh

9     Circuit has held that the lack of an arbitration clause is

10    substantial evidence of no intent to arbitrate.  So the lack of

11    an arbitration clause in the Bridge Financing Agreement or in

12    the Security Agreement where the parties could have very plainly

13    just put that obligation in every single contract across the

14    board tells Your Honor that a breach of that agreement would not

15    be arbitrated.  It was not -- the parties could have very easily

16    have written an arbitration position that would have laid this

17    all to bear, and that's not what happened.

18                What happened was the parties on purpose wrote a very

19    specific and limited arbitration agreement so that if there were

20    disputes about how our post-investment reality was funded, we

21    wouldn't have to run into court, we could fix them.

22                What happened here was that the money never

23    materialized because it was stolen, and that is not something

24    that the parties would have agreed to arbitrate.  If the parties

25    had agreed to arbitrate it, you wouldn't have a Security

1    Agreement, two of them, in each of the three loans that are the

2    subject of the amended complaint that allows immediately to

3    seize our collateral.  You can't square those two things if

4    that's the intent of the parties.

5         So we don't run from the Funding Agreement one iota.

6    It just doesn't speak to the kind of dispute we have here.

7         **THE COURT:**  Let me hear any response from the

8    Defendant.

9         MR. RAMON HERNANDEZ:  Your Honor, first of all, I would

10   object to Plaintiff's characterization as us stonewalling the

11   Court.  We see a jurisdictional question, and we just want to --

12   and our goal has been to get that decided before we move on.

13        Now, I would like to read a moment from the *Fazio* case.

14   I think it speaks directly to the points that Mr. Couriel has

15   made.  It states, "Any doubts about arbitrability should be

16   resolved in favor of arbitrability.  Allegations of fraudulent

17   schemes are no longer sufficient to overcome the strong federal

18   policy in favor of arbitration, claims that, if true, amount to

19   criminal behavior under RICO and antitrust laws are held

20   arbitrable by the Supreme Court."

21        Now, it seems to me that Plaintiff's argument is

22   predicated on one argument and one argument only, that the scope

23   of disputes that would be held arbitrable under the Funding

24   Agreement is so ridiculously narrow that it would essentially

25   never apply.  Because you can always argue, well, that doesn't

1      really go to the crux of the transaction.

2              So what Mr. Couriel is doing is that he is trying to

3      paint these documents as having the BFA was the first agreement,

4      and because the money was pilloried away before it went into the

5      master account, then the Funding Agreement wasn't triggered is

6      essentially what he is arguing.  That is entirely fallacious.

7      Okay?  The Funding Agreement is the primary agreement between

8      the parties.

9              Now, I think that a more accurate way to describe the

10     dynamic between the Funding Agreement and the BFA is a concert

11     ticket.  Okay?  On one side of the concert ticket, it says for

12     the price of $200 you are allowed entry into this concert, and

13     on the back are the terms and conditions.

14             Now, the terms and conditions, which in every contract,

15     in every, you know, contract of adhesion like that, the dispute

16     resolution provision is included in those terms and conditions.

17     Now, what they are trying to do is they say, well, you know,

18     like, look, we didn't agree to the other side of this ticket, we

19     only agreed to the first side of the ticket, and I want to sue

20     on the first side of the ticket.

21             Now, in looking in their arguments, the argument that,

22     well, the Funding Agreement, you know, it didn't contemplate

23     these kinds of disputes.  Of course it did.  The only way that

24     they can include -- the majority of the Defendants in this case,

25     Forrest Capital Partners, Forrest Capital and Co, Jason Van

1    Eman, Benjamin McConley, the two individuals who signed the

2    Funding Agreement, they only exist in this case through the

3    Funding Agreement.

4         So I think that their -- the Plaintiff is trying to

5    muddy the waters here or say that well, you know, there are

6    conflicting -- there are conflicting dispute resolution

7    provisions, but, you know, that should be read in a way that

8    absolutely eviscerates the one true dispute resolution provision

9    which binds all the parties.

10        I don't think that the case law speaks to that.  I

11   think if you look at the *Fazio* case, it's very much -- the law

12   is simple.  If you -- if you cannot sustain a claim without

13   making reference to a particular agreement, then it must be

14   arbitrated.

15        If you look at their amended complaint, as much as they

16   try to minimize the significance of the Funding Agreement, you

17   see that they do -- that they set out the terms explicitly one

18   by one, and they say this didn't happen, it was supposed to

19   happen; this didn't happen, it was supposed to happen.  How can

20   it be said that they don't rely on the Funding Agreement to make

21   their case out?  And if they rely on that document, it must be

22   enforced.

23        MR. COURIEL:  Your Honor, may I just have a brief

24   reply?

25        **THE COURT:**  Very brief, Counsel.

1          MR. COURIEL:  I would just say that the nonsignatories

2     to the Funding Agreement had no standing to compel arbitration,

3     so McConley, Van Eman, and Forrest Capital.  He makes the point,

4     oh, we looped them in.  The truth is they can't even try to

5     compel arbitration because they are not even parties to that

6     agreement.

7          The *Fazio* case that he keeps talking about involved one

8     contract, Your Honor.  It's completely inapposite, even if it

9     were an Eleventh Circuit case, even if it came after *Triple I*,

10    even if it spoke to our situation.

11         So just to conclude, Your Honor, if this is a case

12    where there is a ticket, and on the back side are all the terms

13    and conditions, our problem isn't with the ticket.  We are not

14    disputing the ticket.  We are saying there was another agreement

15    entered into at the same time that was to pay for the ticket,

16    and the failure to pay for the ticket means that the arbitration

17    clause on the back of that ticket is not relevant to the

18    dispute.  The money was never exchanged at the box office.  We

19    don't get into the movie.  So the fact that we can get thrown

20    out of the movie for any reason is a question for another day

21    and doesn't mean that the movie theater can say to us, well, we

22    can throw you out for any reason, you never paid us.  It

23    doesn't -- that Funding Agreement is just like the back of that

24    ticket, and the analogy is here we never paid for it.

25         **THE COURT:**  Well, I think the analysis is more akin to

1    the following, and that is that you have charged an item via

2    your credit card, and for some reason the item never comes, is

3    never delivered, but the agreement to purchase the item was done

4    through the credit card.  And if the credit card for some reason

5    you now have a bill for it, if the credit card is somehow in an

6    arbitrative stage, that's what you would use to dispute the

7    charge.

8         That's where you are here.  That is, whether or not the

9    money was stolen, removed, or otherwise converted, and I'm just

10   using that in a broad sense, I think the correct way to look at

11   this is to allow that portion of the agreement that says any

12   dispute, and this is a dispute, would make it come under the

13   arbitration clause.

14        So my ruling is as follows:  The Defendants' motion to

15   compel arbitration, stay discovery, and stay proceedings, which

16   is docket entry number 75, is granted.

17        I don't think I will have a clear indication of this

18   claim -- of this case what's arbitrable and what's not until

19   after it goes to arbitration and the dispute is further defined.

20        So the Defendants' motion is granted.  Order to enter.

21        Thank you very much, counsel.

22        MR. COURIEL:  Thank you, Your Honor.

23            (Thereupon, the proceedings were concluded

24                    at 12:07 PM.)

25

```
1                        I N D E X

2     ARGUMENT                                      PAGE

3     By Mr. Hernandez..................................  4

4     By Mr. Couriel....................................  12

5     By Mr. Hernandez..................................  20

6     By Mr. Couriel....................................  23

7

8

9

10

11

12

13                  C E R T I F I C A T E

14

15          I, Tamra K. Piderit, Certified Realtime Reporter and

16    Registered Diplomate Reporter, certify that the foregoing is a

17    correct transcript from the record of proceedings in the

18    above-entitled matter.

19          Dated this 16th day of September, 2016.

20

21                      /s/ Tamra K. Piderit

22                      Certified Realtime Reporter
                        Registered Diplomate Reporter
23

24

25
```